# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3873

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BENJAMIN MUOGHALU,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 750-02—**Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 30, 2011—DECIDED NOVEMBER 21, 2011

Before EASTERBROOK, *Chief Judge*, and POSNER and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. A jury convicted the defendant, Muoghalu, of a variety of federal felonies relating to his solicitation and receipt of kickbacks, and the judge sentenced him to 22 months in prison. Muoghalu had been indicted along with Joseph Levato, who had directed the payment of the kickbacks by his firm, but Levato pleaded guilty and testified against Muoghalu.

Muoghalu was the pharmacy director of the Provena St. Joseph Medical Center in Joliet, Illinois, and had considerable, perhaps decisive, influence over the hospital's decisions concerning which drugs to stock. Levato was the local business manager of the pharmaceutical company Aventis (now Sanofi, but we'll stick with the name that the company bore during the period in which the events giving rise to this prosecution occurred). His territory included St. Joseph. Learning that Muoghalu was considering replacing Lovenox, a blood thinner made by Aventis, with Pfizer's blood thinner Fragmin, Levato and an Aventis sales rep met with Muoghalu to try to persuade him to retain Lovenox. Sales of Lovenox to St. Joseph hospital amounted to almost $200,000 a year, and Levato feared that if St. Joseph switched to Fragmin so would other Provena hospitals.

Muoghalu told them at the meeting that he indeed planned to switch the hospital to Fragmin. But later he arranged to meet with Levato alone at a restaurant, and at the meeting offered to make the issue of replacing Lovenox "go away" if Levato would give him two Rolex watches. Levato refused but said that Muoghalu could earn the money to buy the Rolexes himself by giving some speeches for Aventis. Muoghalu agreed. But Aventis thought so ill of Muoghalu's speaking ability that he was never actually asked to give any speeches, and so was paid nothing. Growing impatient, he renewed his threat to replace Lovenox. Levato with his supervisor's concurrence agreed to pay Muoghalu $18,000 not to switch, and made computer entries recording nine nonexistent speeches given by Muoghalu

for Aventis. Muoghalu was paid the $18,000 for the fictitious speeches and later received another $14,000 from Aventis for seven additional fictitious speeches. He held up his side of the bargain—never again did he threaten to abandon Lovenox.

In 2006 an FDA agent who was investigating allegations of misbranding and kickbacks by pharmaceutical companies interviewed Muoghalu and showed him copies of Aventis's records listing the speeches he'd supposedly given for the company. Muoghalu admitted he'd given no speeches yet had received and cashed checks from Aventis, ostensibly for speechmaking, totaling $32,000. He said they were payments for informal talks that he had given to nurses at the hospital during his lunch hour, but he had no documentation to back up the claim, such as notes, slides, or calendar entries.

At trial Muoghalu was the only witness for the defense; none of the nurses who he said had attended talks by him testified. He denied having told Levato that he was considering replacing Lovenox, or having asked Levato for Rolexes or other bribes. His guilt is so plain that we might stop here; none of the alleged trial errors could have affected the result of the trial, assuming, as courts do when assessing trial error, that the jury was reasonable (no one can predict what an unreasonable jury would do). But we'll trudge on.

Muoghalu asks us to reverse his conviction on two grounds, the first being that the government withheld *Brady* material, see *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Gray*, 648 F.3d 562, 566 (7th Cir. 2011),

which is to say that it suppressed material exculpatory evidence that it knew it had, specifically memoranda prepared by the Department of Health and Human Services summarizing the results of an investigation of suspected misconduct by Aventis, including payment of kickbacks—that is, bribes to employees of customers. The memoranda fingered Muoghalu and Levato. The U.S. Attorney's office that was prosecuting Muoghalu discovered the memoranda after the trial ended but before Muoghalu was sentenced, and immediately turned them over to his lawyer. So there was no withholding of exculpatory material unless the HHS investigators should be considered part of the prosecutorial team in this case. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *United States v. Gray, supra*, 648 F.3d at 566; *United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995). But we'll assume they should be.

The district judge rejected the *Brady* claim on the ground that Muoghalu's lawyer had known about the HHS investigation, knew that its targets included not only his client but also the government's principal witness (besides the FDA agent)—Levato—and could have requested the investigatory records if he thought they might undermine Levato's credibility. That's a sound ground for the rejection of the claim.

Furthermore, the right created by the *Brady* decision applies only to evidence favorable to the defense. The documents in question would be unlikely to have strengthened, and might well have weakened, Muoghalu's defense in the minds of jurors.

The Food and Drug Administration had approved Lovenox (enoxaparin sodium) as a blood thinner to be used for the prevention and treatment of deep vein thrombosis (blood clots in veins that are deep inside the body), and for the treatment of certain complications of angina pectoris and of heart attacks. Physicians are authorized to prescribe a drug for a non-approved use, 21 U.S.C. § 396; *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)—the decision to do so being deemed to be within their professional competence—but the drug's manufacturer is forbidden to promote that use, directly or indirectly. 21 C.F.R. § 202.1(e)(6); *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1356 n. 5 (11th Cir. 2011). A qui tam suit against Aventis alleged that the company had violated the law by promoting—sometimes with fatal consequences—Lovenox for non-approved uses, for example for treating heart patients with atrial fibrillation, for use in cardiac catheterization on patients with unstable angina, and for patients undergoing mechanical heart-valve replacement.

All this Muoghalu's lawyer knew; what he didn't know was that the investigation by the Department of Health and Human Services had confirmed the deaths and described them as "linked" to non-approved uses of Lovenox. Muoghalu wanted to argue that these findings by the investigators made Levato fear that he would be prosecuted for homicide and so gave him a strong incentive to cooperate with the prosecution by testifying that Muoghalu had received kickbacks; thus the evidence potentially had impeachment value.

But did it have more impeachment value than the unconfirmed allegations of patient deaths? Probably not, because there is no indication that Levato knew more than the allegations. And anyway, knowing about the HHS investigation Muoghalu's lawyer could have requested the results.

Even if the confirmation of patient deaths would have had an incremental impeachment value in the cross-examination of Levato, Muoghalu's lawyer surely didn't want to connect his client to a drug "linked" to patient deaths. But it would have been impossible to connect Levato but not Muoghalu, who had been paid $32,000 not to yank Lovenox from St. Joseph hospital. A jury told about the patient deaths might think Muoghalu and Levato little better than a pair of murderers. That might not be a legitimate inference; for all we know, Muoghalu was unaware that Lovenox was being prescribed inappropriately, that Aventis had been accused of encouraging such prescriptions, and that deaths had resulted—the investigation by the Department of Health and Human Services did not identify any deaths at St. Joseph. And an investigative finding carries less weight than a judicial determination after trial or an agency's determination after an adversarial adjudication. Muoghalu's lawyer could have tried to explain all this to the jury, but his explanation probably would not have erased the inference that Levato and Muoghalu had been endangering human life for financial gain.

As cases in this and other courts have noted, see, e.g., *Payne v. Tennessee*, 501 U.S. 808, 819 (1991); *United States*

*v. Alvarado-Tizoc*, No. 10-1613, 2011 WL 3904083, at *2 (7th Cir. Sept. 7, 2011); *Milner v. Apfel*, 148 F.3d 812, 815 (7th Cir. 1998); *United States v. Martinez*, 16 F.3d 202, 205-06 (7th Cir. 1994); *United States v. Tham,* 118 F.3d 1501, 1507 (11th Cir. 1997); *United States v. Smith*, 27 F.3d 649, 652-53 (D.C. Cir. 1994), our moral code includes a form of strict liability—what philosophers call "moral luck." See Thomas Nagel, "Moral Luck," in Nagel, *Mortal Questions* 24 (1979); Bernard Williams, "Moral Luck," in Williams, *Moral Luck: Philosophical Papers 1973-1980* 20 (1981); Williams, "Moral Luck: A Postscript," in his book *Making Sense of Humanity and Other Philosophical Papers 1982-1993* 241 (1995). The concept has infiltrated the law. If two drivers are equally careless, and one driver has an accident in which another person is killed and the other driver has no accident, the first gets charged with homicide and the second gets a ticket (maybe). Yet they'd made identical choices and performed identical acts, and the difference in consequences was a matter purely of chance—but consequences even when fortuitous have an effect on our evaluation of the goodness or badness of an act.

This effect is embedded in the criminal code and sentencing guidelines. See, e.g., 18 U.S.C. § 1111(a); U.S.S.G. §§ 5K2.1, 5K2.2, 5K2.3, 5K2.5; Kevin Cole, "Killings during Crime: Toward a Discriminating Theory of Strict Liability," 28 *Am. Crim. L. Rev.* 73, 74 (1990). Despite all the explaining away that Muoghalu or his lawyer might have attempted had the jury been apprised of patient deaths from non-approved uses of Lovenox, the jury would have been likely to infer that for purely pecu-

niary gain Muoghalu had refused to replace a drug im-
plicated in patient deaths as a result of misconduct
by Lovenox's manufacturer; that he had risked patient
lives, though probably unwittingly; and that while
maybe no one had died at Muoghalu's hospital the pos-
sibility of a patient's death could not be excluded. So
moral luck favored Muoghalu in one sense: there was no
*proof* that he had caused any deaths. But it hurt him
in another sense: he may have contributed to creating a
risk of death. A risk of death is not a death, but it is a
consequence that weighs in people's thinking even if it
was created unintentionally. Had Muoghalu's lawyer
told the judge and jury about the risk that his client
had endangered lives, Muoghalu would now be arguing
for a new trial on the ground of ineffective assistance
of counsel.

A risk of patient deaths would make judge and jury
think worse of Levato as well, but the jury might well
have found him the more sympathetic of the two defen-
dants. He got off with probation, maybe because the
government and the judge believed that he was the
victim of extortion—which if so made Muoghalu the
extortionist.

Against all this it can be argued that to a "reasonable"
jury the patient deaths could be relevant only to Levato's
credibility—they could not be relevant to the truthful-
ness of Muoghalu's denial of extortion and claim to
have given the talks for which he was paid. But
evidence can of course be irrelevant yet prejudicial, and
a competent lawyer strives to exclude such evidence if
his client would be the victim of the prejudice. Even if

the evidence of patient deaths was legally relevant only to Levato's credibility, its presentation to the jury would have been prejudicial to Muoghalu by associating him with patient deaths from illegal promotion of Lovenox. It is doubtful that its prejudicial effect would have been offset by its effect in undermining Levato's testimony, and if the effects were offsetting, the evidence would not have been *Brady* material. In deciding whether evidence is *Brady* material—that is, whether if known to and used by the defense it would have increased the chances of an acquittal—the court has to determine the likely *net* impact of the evidence, with realistic awareness of prejudice as well as probativeness.

In any event, as we said earlier, a distinct reason against inferring a violation of *Brady* is that the government had already armed Muoghalu with all the information that his lawyer could have used to impeach Levato's testimony.

The second ground of appeal is that the judge should have allowed the lawyer more leeway at trial to explore the interview of his client by the FDA agent. The lawyer wanted to be allowed to ask the agent on cross-examination whether Muoghalu had asked for the presence of a lawyer during the interview. We don't understand the relevance of the question, and so we think the judge was right to forbid it. Muoghalu was not under arrest when he was interviewed, and so he could have refused to be interviewed had the agent refused to interview him in the presence of a lawyer.

Muoghalu's lawyer also wanted his client to be permitted to testify to what he had said during the inter-

view. The agent testified to his own version of what had been said, and that version included fatal admissions by Muoghalu. Muoghalu could, without violating the hearsay rule, have testified to what had been said at the interview (which had not been recorded); but when the judge rejected the request of Muoghalu's lawyer that his client be permitted to testify to what had been said, the lawyer made no offer of proof—no indication of what he thought such questioning would produce that would be material. By failing to make an offer of proof, he forfeited a challenge to the judge's ruling. Fed. R. Evid. 103(a)(2); *United States v. Bartlett*, 567 F.3d 901, 910 (7th Cir. 2009).

Anyway the challenge has no merit. Rule 106 of the Federal Rules of Evidence provides that "when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be con-sidered contemporaneously with it"; and under the name "rule of completeness," the principle of Rule 106 has been extended to nonrecorded statements. *United States v. Price*, 516 F.3d 597, 604-05 (7th Cir. 2008); *United States v. Li*, 55 F.3d 325, 329-30 (7th Cir. 1995); *United States v. Range*, 94 F.3d 614, 621 (11th Cir. 1996). How rules proliferate in American law! One doesn't need a rule of "completeness" to allow a defendant to testify, in the case of an unrecorded interrogation, that the interrogator's version of what the defendant said is false, or was taken out of context; and in the latter instance the defendant can testify to the context

("surrounding circumstances"). But Muoghalu's counsel has never indicated what his client would have said had he been permitted to testify about the interview.

AFFIRMED.