**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 11-4181**
_____

LESLIE WERTH, a/k/a Les Werth,

                Plaintiff - Appellant,

      v.

UNITED STATES OF AMERICA,

                Defendant - Appellee.

_____

**No. 11-4444**
_____

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

CHRISTOPHER TIMBERS, a/k/a Alibi,

                Defendant - Appellant.

_____

**No. 11-4445**
_____

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

MARK JASON FIEL, a/k/a Jason,

                Defendant - Appellant.

**No. 11-4446**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

      v.

JACK ROSGA, a/k/a Milwaukee Jack,

          Defendant - Appellant.

**No. 11-4448**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

      v.

HARRY RHYNE MCCALL,

          Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, District Judge.  (3:10-cr-00170-HEH-23, 3:10-cr-00170-HEH-21, 3:10-cr-00170-HEH-6, 3:10-cr-00170-HEH-1, 3:10-cr-00170-HEH-15)

Submitted:  June 15, 2012      Decided:  August 2, 2012

Before TRAXLER, Chief Judge, and NIEMEYER and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

J. Brian Donnelly, J. BRIAN DONNELLY, PC, Virginia Beach, Virginia, for Appellant Mark Jason Fiel; William J. Dinkin, STONE, CARDWELL & DINKIN, PLC, Richmond, Virginia, for Appellant Jack Rosga; Craig W. Sampson, BARNES & DIEHL, PC, Chesterfield, Virginia, for Appellant Leslie Werth; Ali J. Amirshahi, Richmond, Virginia, for Appellant Christopher Timbers; Charles D. Lewis, LAW OFFICE OF CHARLES D. LEWIS, Richmond, Virginia, for Appellant Harry Rhyne McCall. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Peter S. Duffey, Assistant United States Attorney, Richard D. Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2010, over twenty members of the Outlaws motorcycle gang ("Outlaws") were indicted for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") and several other offenses. Five of the Outlaws members who were convicted appeal their convictions and sentences on various grounds. Finding no error, we affirm.

I.

A.

The Outlaws is a "one-percenter" motorcycle gang, meaning that its members are part of the one percent of motorcyclists who decline to abide by societal rules and laws. Central to the organization is the culture of violence that it fosters. As relayed through trial testimony, frequent territorial disputes, particularly with the Outlaws' main rival, the Hell's Angels, involved the use of force or threatened force as the Outlaws sought to expand and maintain its territories for the sake of notoriety and financial gain. Within the organization, violence and the threat of violence were also used to maintain compliance with internal rules.

The organization has a multi-level, well-organized chain of command. All Outlaws members belong to a specific chapter, the chapters are grouped into several color-coded

4

regions, and the regions all fall under the authority of the national president. Each chapter has a clubhouse, within which weekly chapter meetings, called "church," take place. Higher level meetings between regional bosses or the national leadership of the organization also occur on a consistent basis. Appellant Jake Rosga was a member of the Gold Region (Milwaukee, Wisconsin, chapter) and, at all times relevant, served as the national president of the organization. The other appellants—Leslie Werth, Christopher Timbers, Harry Rhyne McCall, and Mark Jason Fiel—were all members of chapters within the Copper Region, which covers North Carolina, South Carolina, and Virginia. Werth was the president of the Copper Region.

In September 2008, Special Agents Jeffrey Grabman and Daniel Ozbolt of the Bureau of Alcohol, Tobacco and Firearms ("ATF") began infiltrating the Outlaws in the Richmond, Virginia area. The agents posed as members of a separate motorcycle club called the Mongols. At that time, the Outlaws did not have a chapter in Richmond, so conversations between the Outlaws and the undercover agents focused initially on the Outlaws developing a relationship with the Mongols as a support club in the area.[1] The Hell's Angels were beginning to develop a

---

[1] Support clubs are smaller motorcycle gangs that assist the Outlaws in their efforts to dominate a particular territory. This support comes in the form of providing intelligence on (Continued)

foothold in Richmond, so the Outlaws were eager to build a network in the area by establishing support clubs, with hopes of ultimately recruiting members from the support clubs and moving into the area themselves.

By late October, Outlaws members expressed interest in the undercover agents joining the Outlaws and starting a chapter in the Richmond area. The agents were voted into the club in January 2009 as prospective members and ultimately started an Outlaws chapter in Petersburg, Virginia. By May 2009, the undercover agents had set up a clubhouse in the Petersburg area. Unbeknownst to the other Outlaws members, the undercover agents had wired the clubhouse for video and audio recording. During their time undercover, the agents participated in numerous Outlaws activities in a number of different states.

B.

Search warrants for multiple Outlaws clubhouses were executed on June 15, 2010, yielding, among other things, firearms and illegal drugs. Many Outlaws members were subsequently arrested and charged with various offenses. During

---

rival gangs in the area, buying Outlaws gear to raise money, and serving as a pool of potential new Outlaws members.

the subsequent trials,[2] the government, with the aid of testimony from the undercover agents and recordings from the Petersburg clubhouse, presented extensive evidence about the Outlaws' activities, which included murder, attempted murder, robbery, assault, extortion, arson, witness intimidation, narcotics violations, illegal gambling, and weapons violations. Each of the defendants in this consolidated appeal was convicted of conspiracy to violate RICO ("Count 1"), see 18 U.S.C. § 1962(d); and conspiracy to commit violence in aid of racketeering ("Count 2"), see 18 U.S.C. § 1959(a)(6). Timbers and McCall were also convicted of violence in aid of racketeering ("Count 3"), see 18 U.S.C. §§ 1959 and 2. McCall was additionally convicted of possession of a firearm in furtherance of a crime of violence ("Count 4"), see 18 U.S.C. §§ 924(c) and 2.

## II.

We first address related claims made by multiple defendants concerning the disclosure of evidence and the scope of cross-examination. Pursuant to its obligations under Brady

---

[2] The Outlaws members charged in the superceding indictment who did not plead guilty were tried in two separate trials. Of the five defendants in this case, only Werth was tried and convicted in the first trial. Rosga was also tried in the first trial, but after the jury could not reach a verdict on the counts against him, the government retried Rosga with the second group of defendants.

v. Maryland, 373 U.S. 83 (1963), and its progeny, the government disclosed certain information to the defense about the undercover ATF agents. Specifically, the government disclosed that Grabman had been suspended by ATF in 1991 when his training officer lied about the circumstances surrounding a speeding incident and Grabman falsely corroborated the story. The government also disclosed that Ozbolt, during the course of his investigation into the instant matter, received a DUI citation, a reckless driving citation, and a speeding ticket.

Rosga and Fiel filed a motion seeking disclosure of supporting documents and other evidence related to these incidents. The government thereafter filed motions seeking to preclude the defense from cross-examining the agents about the incidents at trial and objecting to the document request. As to the document request, the government explained that the documents relating to Agent Grabman had long ago been purged by ATF as part of its standard procedures and were no longer available. With regard to Agent Ozbolt, the government submitted the supporting documents to the court for in camera review, arguing that the documents contained no impeachment material that had not already been disclosed. The district court ordered the government to disclose documents relating to Agent Ozbolt's apparent failure to advise his superiors about one of the citations, but the court otherwise agreed with the

8

government and held that the remaining documents did not contain "exculpatory, relevant, or admissible" information. J.A. 2050. The district court also granted the government's motion to limit the cross-examination of the agents about these incidents.

Rosga, Timbers, and McCall challenge these rulings on appeal.[3] We review a district court's decision concerning the disclosure of documents reviewed <u>in camera</u> for clear error, <u>see</u> <u>United States v. Trevino</u>, 89 F.3d 187, 193 (4th Cir. 1996), and a district court's limitations on a defendant's cross-examination of government witnesses for abuse of discretion, <u>see United States v. Smith</u>, 451 F.3d 209, 220 (4th Cir. 2006).

### A.

Turning first to the disclosure of documents, the district court did not clearly err in denying the defense motion for disclosure of documents related to Grabman. The government represented that all such documents relating to the 1991 incident had been purged according to ATF protocol. The defense does not contend otherwise, nor does the defense argue that the

---

[3] Despite the fact that Fiel raised these issues below, he failed to raise them on appeal and has therefore waived them. <u>See</u> <u>United States v. Brooks</u>, 524 F.3d 549, 556 n.11 (4th Cir. 2008).

documents were available to the government from another source. Because the documents were no longer available, the defense cannot prove "that the evidence was suppressed by the government." United States v. Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010) (internal quotation marks and alterations omitted); see also United States v. Capers, 61 F.3d 1100, 1103 (4th Cir. 1995) (explaining that government's duty to disclose does not extend to information not in its possession).

The district court likewise did not clearly err in denying the defense motion for disclosure of documents related to Ozbolt. The district court held that the documents provided no impeaching information beyond that already disclosed by the government. Despite having access to these documents during the pendency of this appeal, the defendants have not identified any impeaching facts in the documents that had not already been disclosed. The defendants have thus failed to establish that the government suppressed favorable evidence.

The defendants seem to contend that under Brady and its progeny, the government was somehow obligated to conduct its own investigation of the incidents and turn over the results of that investigation to the defense. This argument is without merit. While the government is obligated to disclose favorable evidence in its possession, it is not required to create evidence that might be helpful to the defense. See United

10

States v. Gray, 648 F.3d 562, 567 (7th Cir. 2011) ("We find the proposed extension of Brady difficult even to understand. It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence." (internal quotation marks omitted)); United States v. Alverio-Meléndez, 640 F.3d 412, 424 (1st Cir. 2011) ("The failure to create exculpatory evidence does not constitute a Brady violation.").

B.

Turning to the district court's decision to limit the defendants' opportunity to cross-examine Agents Grabman and Ozbolt, we find that the court did not abuse its discretion. Federal Rule of Evidence 608(b)(1) gives district courts discretion to allow inquiry into specific instances of misconduct during cross-examination "if they are probative of the character for truthfulness or untruthfulness of . . . the witness." We have previously explained that the proper factors to be considered by a district court in exercising this discretion include "the importance of the testimony to the government's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by evidence sought to be adduced." United States v. Leake, 642 F.2d 715, 719 (4th Cir. 1981).

11

With regard to questioning Grabman about the 1991 incident, the court doubted the relevance of the possible testimony in light of the fact that the incident was remote in time. The court also expressed concern about delaying a long trial with what it viewed as "a complete diversion of th[e] jury's time and attention." J.A. 328. Thus, the court considered the proper factors and did not abuse its discretion.

We likewise find no abuse of discretion in the district court's decision to limit the cross-examination of Agent Ozbolt. Ozbolt received the citations at issue while he was working undercover on this case, and the "false statements" at issue—Ozbolt's use of his undercover identification—were necessary for Ozbolt's own safety and to ensure that the investigation was not compromised. If the defense had been permitted to cross-examine Ozbolt about these incidents, the government likely would have had to question Ozbolt about agency rules and policies for working undercover and about the dangers to Ozbolt and the investigation on whole if Ozbolt's cover had been blown. Permitting inquiry into these issues would have needlessly complicated the case and confused the jury. The district court, therefore, did not abuse its discretion. See United States v. Bynum, 3 F.3d 769, 772 (4th Cir. 1993) ("The purpose of [Rule 608(b)] is to prohibit things

12

from getting too far afield—to prevent the proverbial trial within a trial.").[4]

### III. Jack Rosga

Along with the arguments addressed in Section II(A) & (B), Rosga advances two additional arguments on appeal. His first contention is that the district court abused its discretion, see United States v. Summers, 666 F.3d 192, 197 (4th Cir. 2011), in refusing to admit a recorded statement of Outlaws member Joseph Allman in which Allman allegedly ordered the shooting of a Hell's Angels member. Although the district court initially admitted the evidence for a limited purpose, the court later admitted the evidence without limitation. Therefore, this claim is without merit.

Rosga's second contention is that the district court made two errors at sentencing. Applying an abuse of discretion standard, we review sentences for reasonableness and examine sentences for substantive and procedural errors. See United States v. Hornsby, 666 F.3d 296, 312 (4th Cir. 2012). We review

---

[4] To the extent that the defendants are also suggesting that the district court's limitation on cross-examination violated their rights under the Confrontation Clause, we find that contention to be unpersuasive.

13

factual findings, however, for clear error. See United States v. Powell, 680 F.3d 350, 359 (4th Cir. 2012).

Rosga first contends that the court committed procedural error by considering the attempted murder of a Hell's Angels member by two other Outlaws members to be relevant conduct under U.S.S.G. § 1B1.3(a) (2010). Under the Guidelines, "relevant conduct" includes "all acts" that were "reasonably foreseeable" to Rosga and within "the scope of the criminal activity [that he] agreed to jointly undertake." U.S.S.G. § 1B1.3(a) & cmt. n.2. At sentencing, the district court relied on extensive trial testimony showing that Rosga, as the president of the organization, "promoted a culture of violence," "gave the green light to retaliate and assault" others, "instructed Grabman, and other Outlaw members, to shoot Hells Angels' members . . . if necessary," and "had declared war on the Hells Angels." J.A. 4644-46. In light of this evidence, we conclude that the district court did not commit clear error in finding the shooting to be relevant conduct.

Rosga also challenges the substantive reasonableness of his sentence. Although his Guidelines range was 324-405 months, the district court imposed a 240-month sentence, composed of the statutory maximum on Count 1, see 18 U.S.C. 1963(a), and a concurrent 36-month sentence on Count 2. On appeal, Rosga argues that a 240-month sentence is greater than

14

necessary to protect the public and creates unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(2)(C), (6). Having reviewed the arguments and the sentencing transcript, we find the sentence imposed to be reasonable and, therefore, find that the district court did not abuse its discretion.

## IV. Leslie Werth

Werth's only argument on appeal is that the evidence adduced at the first trial was insufficient to convict him on the predicate drug offense for maintaining a drug-involved premises, see 21 U.S.C. § 856(a), necessary for conviction on the RICO conspiracy count, see 18 U.S.C. § 1962(d), because he himself did not use, sell, or condone the use or sale of illegal drugs. Although Werth made a motion for judgment of acquittal before the district court pursuant to Federal Rule of Criminal Procedure 29, advancing certain arguments, he did not assert the argument that he makes now on appeal. Werth, therefore, has waived this claim of error. See United States v. Chong Lam, 677 F.3d 190, 200 (4th Cir. 2012) ("When a defendant raises specific grounds in a Rule 29 motion, grounds that are not specifically raised are waived on appeal.").

In any event, even if Werth had not waived this challenge, we find that sufficient evidence supported his conviction for maintaining a drug-involved premises. Werth

15

argues that he did not personally use or condone the use of drugs and that the primary purpose of the clubhouses was not the use and distribution of drugs. As to the former argument, Werth need not have committed the substantive offense himself. "[I]t suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Salinas v. United States, 522 U.S. 52, 65 (1997). As to the latter argument, drug use need not be the primary purpose of the clubhouses. It is sufficient under 21 U.S.C. § 856 that the use and distribution of drugs was one of the purposes of the clubhouses. See United States v. Roberts, 913 F.2d 211, 220 (5th Cir. 1990). Therefore, even if Werth had preserved this challenge, it would be without merit.

## V. Christopher Timbers

In addition to the arguments addressed in Section II(A) & (B), Timbers raises several other arguments.

### A.

His first additional contention is that the district court abused its discretion, see Summers, 666 F.3d at 197, by permitting the government to present evidence of an assault. According to the evidence adduced at trial, Grabman and Ozbolt met with Timbers, Fiel, and another Outlaws member in a restaurant to discuss the possibility of Grabman and Ozbolt

16

joining the Outlaws. At some point during this meeting, Timbers and Fiel, unprovoked, attacked Clifford Diggs, an African-American male and restaurant patron. Fiel allegedly uttered racial epithets during the course of this event, and Diggs ultimately suffered a broken nose and a broken jaw.[5] The district court permitted the government to introduce evidence of the assault itself but restricted the government from introducing evidence of the racial epithets uttered by Fiel or the racial motivation underlying the attack. Timbers challenges this ruling on appeal, arguing that the district court abused its discretion under Federal Rule of Evidence 404(b) by permitting the government to introduce evidence of the assault.

"Rule 404(b) limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence of intrinsic acts." United States v. Lighty, 616 F.3d 321, 352 (4th Cir. 2010). An act is intrinsic to the charged act, in this case the RICO conspiracy (Count 1), if "both acts are part of a single criminal episode," United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996) (internal quotation marks omitted), or if evidence of the intrinsic act

---

[5] Based on this incident, the government also charged Fiel and Timbers with a civil rights violation, but that count in the indictment was severed from the others and is not at issue in this appeal.

17

"serve[s] to complete the story with respect to the scope of the . . . conspiracy," United States v. Lipford, 203 F.3d 259, 268 (4th Cir. 2000), and "provide[s] context relevant to the criminal charges," United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007). In this case, the assault occurred while the undercover agents were meeting with Outlaws members to discuss joining the group. Moreover, the assault occurred in a geographical area where the Outlaws sought to expand and needed to establish their dominance in order to control the territory. Given these facts, we find that the assault was intrinsic to the RICO conspiracy and, therefore, conclude that the district court did not abuse its discretion in permitting the government to introduce evidence of the assault.

B.

Timbers' second additional challenge is to the sufficiency of the evidence as to each of the counts in the indictment for which he was convicted, Counts 1-3. "We review the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction." United States v. Jaensch, 665 F.3d 83, 93 (4th Cir. 2011) (internal quotation marks omitted). "[S]ubstantial evidence is evidence that a reasonable finder of

18

fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

With regard to Count 1, the RICO conspiracy, the government contends that Timbers waived his sufficiency challenge on appeal. Assuming, but without deciding, that Timbers preserved this claim on appeal, we find that substantial evidence supported his conviction. To prove a RICO conspiracy under 18 U.S.C. § 1962(d), the government had to establish that Timbers conspired to engage in a "'pattern of racketeering activity,'" which "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The jury found that Timbers conspired to plan or commit more than two predicate acts of racketeering, including multiple acts of extortion, a single act of witness tampering, multiple acts of interstate travel in aid of racketeering, and multiple acts of distribution of controlled substances. The jury's finding that Timbers conspired to distribute controlled substances was supported by direct testimony from Outlaws member Lyle Beaty that Timbers distributed cocaine on several occasions. Likewise, the jury's finding that Timbers conspired to commit an act of witness tampering was supported by direct testimony from Agent Ozbolt.

19

Therefore, the evidence was sufficient to support Timbers' conviction for the RICO conspiracy.[6]

Similarly, with regard to Count 2, conspiracy to commit violence in aid of racketeering, and Count 3, violence in aid of racketeering, substantial evidence supported Timbers' convictions. As to Count 3, the government presented evidence that Timbers participated in an assault of and standoff with a rival motorcycle gang in a bar in Richmond. Specifically, Timbers was engaged in planning sessions before the incident, and he served as a cover for another Outlaws member who stood across the street from the bar and attempted to draw in members of a rival motorcycle gang. After a fight ensued in the bar and a rival gang member was seriously injured, Timbers joined other Outlaws members outside the bar in a "battle wedge" formation to search for members of the rival gang. The group found and approached rival gang members, and one of the Outlaws members

---

[6] Our conclusion in this regard makes it unnecessary to consider Timbers' sufficiency-of-the-evidence arguments as to the other predicate offenses. We note, however, that the thrust of Timbers' arguments is that he did not personally engage in or plan the multiple acts of extortion and interstate travel in aid of racketeering. However, this level of personal involvement is not necessary to prove guilt on predicate offenses sufficient to uphold a RICO conspiracy conviction. See Salinas, 522 U.S. at 65 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.").

made threatening comments while showing that he was carrying a pistol. Although Timbers may not have engaged in any violence personally, he certainly aided and abetted the violence central to this incident. Therefore, the evidence is sufficient to uphold Timbers' conviction on Count 3. See 18 U.S.C. §§ 1959(a)(3) and 2; Va. Code Ann. §§ 18.2-22, -51, -282. And although this incident alone did not serve as the basis for Timbers' conviction on Count 2, having determined, based on the evidence discussed above, that sufficient evidence supported his conviction on the substantive offense in Count 3, we also conclude that sufficient evidence supported his conviction for conspiracy to commit the substantive offense in Count 2. See 18 U.S.C. § 1959(a)(6).

## VI. Harry McCall

In addition to the arguments addressed in Section II(A) & (B), McCall also challenges the denial of his motion for acquittal as to Count 4, possession of a firearm in furtherance of a crime of violence. We review this claim de novo and "decide whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. United States v. Ramos-Cruz, 667 F.3d 487, 499 (4th Cir. 2012) (internal quotation marks omitted). In this case,

21

multiple witnesses testified that McCall possessed a firearm when he and other Outlaws members entered a bar in Petersburg, Virginia, and assaulted members of a rival group in an attempt to assert control over the territory. Therefore, substantial evidence supports McCall's conviction for possession of a firearm during the commission of the assault, and the district court did not err in denying the motion for acquittal.

## VII. Mark Fiel

Finally, Fiel raises two claims on appeal, both of which can be resolved summarily. His first challenge is to the district court's denial of his motion to suppress evidence seized from his vehicle. Specifically, Fiel's motion sought to suppress a semiautomatic Glock handgun, evidence seized from the search of his backpack, and his cellular phone, the contents of which were searched pursuant to a warrant. On appeal, the government contends that none of this evidence was introduced at his trial. Fiel does not dispute this contention nor does he direct the court to a place in the record where any of this evidence was used at trial. Therefore, any error the district court may have made in denying the motion to suppress would be harmless. See United States v. Ford, 986 F.2d 57, 60 n.2 (4th Cir. 1993) (applying harmless error to denial of suppression motion); United States v. Civella, 666 F.2d 1122, 1130 (8th Cir.

1981) (finding denial of motion to suppress to be harmless where "[n]one of the material [at issue] was introduced into evidence").

Fiel's second argument, which he makes for the first time on appeal, is that the district court failed to provide notice of its intent to depart from the Guidelines range, as required by Federal Rule of Criminal Procedure 32(h). The district court, however, imposed a variance rather than a departure, and Rule 32(h) does not require a district court to provide notice of its intent to impose a variance at sentencing. See Irizarry v. United States, 553 U.S. 708, 714 (2008).

## VIII. Conclusion

For the foregoing reasons, we affirm the convictions and sentences addressed herein. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

AFFIRMED

23