Filed 10/24/25  P. v. Singh CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PRADIP SINGH,<br><br>Defendant and Appellant. | F087886<br><br>(Super. Ct. No. CR-21-010738)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Robert B. Westbrook, Judge.

Robert N. Treiman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Pradip Singh (defendant) guilty of misdemeanor assault as a lesser included offense of felony assault.  The centerpiece of the People's case was a video recording of the incident.  The recording was made on an iPhone by someone closely associated with the complaining witness.

Segments of the recording were provided to the defense in pretrial discovery, but it was not the original source material. A police officer had used his cell phone to record the video as it was being played on a different device. The officer did not edit the footage, he merely recorded what was shown to him by the complaining witness. The defense was given the officer's cell phone video. In other words, a recording of the recording.

Shortly before trial, it was revealed the People had inadvertently withheld the source material. The original recording had an additional 31 seconds of previously undisclosed footage of events preceding the altercation. Although this footage tended to depict defendant as the initial aggressor, it arguably demonstrated that the complaining witness escalated the conflict. The footage clearly showed the complaining witness holding a hammer, which was only barely visible in the officer's cell phone video.

At the beginning of trial, defense counsel informed the trial court about the delayed disclosure of the complete recording. Defense counsel repeatedly stated, however, that he "did not want to continue the case" because he perceived the additional footage as helpful to defendant's claim of self-defense. Defendant now alleges his due process rights were violated by the late discovery of that footage. He essentially complains of not having enough time to fully develop and refine his trial strategies.

Had defendant asked for a continuance and been denied more time to prepare, he might have a viable argument. The failure to request a continuance or seek any other remedy at trial is "fatal" to his claim. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1103.) It is defendant's burden to establish not only the delayed disclosure of favorable evidence, but also "'that a continuance would not have cured the harm.'" (*Ibid*.) Defendant is unable to meet his burden.

FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

**General History**

In September 2021, defendant and his ex-wife were in the process of finalizing their divorce. Defendant was no longer living in the marital home, but his ex-wife was residing there with V.S. (a man described in the record as her then boyfriend or fiancé). Defendant was not on good terms with either of them. His ex-wife had obtained a restraining order against him, and V.S. had allegedly threatened him with bodily harm approximately two weeks prior to the events at issue.

The marital home was located next to an automobile repair shop owned and operated by defendant. Both structures were on the same lot but had different street addresses. Defendant and his ex-wife agreed to a financial settlement under which defendant would regain possession of the house. As part of the agreement, the ex-wife and V.S. were to vacate the premises by the end of the month. In the meantime, and despite the restraining order, defendant regularly parked his vehicle in a location that required him to walk past the house on his way to and from work.

**September 3, 2021**

On the afternoon of September 3, 2021, police officers were dispatched to the address of the marital home in response to several 911 calls. The callers included defendant and his ex-wife. Defendant said to the dispatcher, "Yeah, this person tried to attack me with a hammer." The dispatcher asked for the address, which defendant provided, and then asked if defendant was bleeding. Defendant replied, "No, he's bleeding because I had to protect myself. Please send somebody over here right now."

In the ex-wife's call, she told the dispatcher, "Uh, my ex-husband attacked, uh, my, m-, my mechanic here." The dispatcher said they had already received calls and asked her to hold for a moment. During the break in the conversation, the ex-wife could be heard providing information to people at the scene. Her statements included, "I have

it on video" and "That guy in the blue t-shirt [defendant] attacked my driver here." When the dispatcher came back on the line, the dispatcher asked if she was reporting "the hammer incident." The ex-wife replied, "Yes, not the hammer the—he attacked with some kind of tool to [V.S.,] to my co-driver here…." She later restated the full name of the alleged victim, V.S.[1]

When police arrived at the scene, defendant gave a statement to the primary investigating officer. The conversation was recorded on the officer's body camera. The video was later admitted into evidence at trial as People's exhibit 13.

Defendant alleged V.S. "came out of his truck with a hammer" as defendant was walking toward or past him. Gesturing with his arm raised and hand cocked back at approximately shoulder level, defendant further stated V.S. "had his hammer and was ready to swing." Defendant continued: "So I had this pepper spray and I sprayed him. And then he ran and he was still trying to swing and I hit him with that [pointing to an object on the ground] when he was trying to swing with the hammer."

Immediately following his initial allegations about the hammer, defendant again stated, "He took it like this and he was ready to swing at me and that's when I sprayed him." Defendant made similar demonstrative gestures, now raising his fist higher above his shoulder than before. A few minutes later, defendant retold the story to another police officer.

Defendant's second recounting of the incident was also recorded. The body camera footage was admitted into evidence at trial as People's exhibit 14. Defendant

---

[1]V.S. was outside working on the ex-wife's car immediately prior to the incident, which may explain why she called him "my mechanic." It is unclear from the record why the ex-wife used language suggesting V.S. was an employee or hired help rather than her cohabitant and romantic partner. She did this again several hours later when the police returned to the house to explain why they could not issue an emergency protective order for defendant to stay away from V.S. Defendant's exhibit C from the trial, which is part of the supplemental clerk's transcript, contains body camera footage wherein an officer is heard asking, "Was your boyfriend assaulted earlier?" She replies, "[Not] boyfriend, my team driver." When the officer later referred to V.S. as her boyfriend a second time, she again told him, "Not my boyfriend, my team driver."

4.

again gestured with his fist raised above his shoulder and said, "He had that thing really close to my face, he had it wound like this, [and] right when he did that's when I sprayed him." The officer said, "And he had a hammer?" Defendant replied, "Yeah he had a hammer in his hand, he had the hammer ready to swing. … Once that hammer went up like this [gesturing], that's when I sprayed him."

V.S. was evaluated by paramedics at the scene. He was then transported to a hospital and received stitches to close a "one-centimeter laceration" in the area of his left temple. The investigating officer took a statement from V.S. at the hospital later in the day.

Video of V.S.'s hospital interview, recorded on the officer's body camera, is included in the record as part of defendant's exhibit C. The exhibit contains 15 video files and three audio files consisting of the 911 calls, police body camera footage, and the video recorded by the investigating officer on his "work cell phone." As noted in defendant's briefs, not all of the files were played for the jury at trial.

Although V.S. speaks and understands some English, the hospital interview was conducted through a physician's assistant who functioned as a Punjabi language interpreter. V.S. admitted having a hammer in his hand during the altercation. He claimed to have armed himself only because defendant accosted him with an L-shaped metal rod. V.S. also claimed to have dropped the hammer when defendant pepper-sprayed him. He denied ever swinging the hammer.

The investigating officer said to the interpreter, "Tell him right now I haven't made the arrest because I wanted to get his side of the story 'cause I only got his fiancée's [defendant's ex-wife's] and the other guy's [defendant's] side, and it was really hard to make a determination because the other guy was claiming self-defense as well, so I couldn't place him under arrest." "I'm going to see if I can contact the guy [defendant] and place him under arrest for assault with a weapon…."

5.

The officer's statements are noted here because of appellate counsel's apparent confusion regarding when and why defendant was arrested. In the opening brief, it is argued defendant might not have been arrested but for the police being "misled at the scene" by an edited version of the iPhone recording. The argument is refuted by both the hospital interview video and additional police body camera footage recorded the next day.

**September 4, 2021**

Defendant's exhibit C includes a video file labeled "Code_6-3," which is approximately 1 hour and 23 minutes in length. It was recorded on the investigating officer's body camera on September 4, 2021, i.e., the day after the incident. (All videos discussed with regard to this date are from the same exhibit). A digital clock embedded on the video shows the recording was made between 9:12 a.m. and 10:35 a.m. The date and time of the footage matches the information displayed on the officer's cell phone whenever the phone is visible on the screen, and it is likewise consistent with a wall clock in defendant's auto repair shop. We thus assume the information is displayed in Pacific Daylight Time.

The opening minutes of the "Code_6-3" video show the officer driving in his police car. At approximately 9:12 a.m., he receives a phone call from defendant's ex-wife. She can be heard saying, "We have pulled up some of the videos … that I think you need to see. It's very very important." The officer replies, "Ok, are you home right now cause I was actually on my way to your house." She says yes, and the officer proceeds to drive there.

Upon entering the home and before viewing any of the videos they wanted to show him, the officer told V.S. and the ex-wife, "Now I do have enough to make the arrest…." The officer then viewed an assortment of videos contained on a cell phone in V.S.'s possession. While it is possible the phone belonged to someone else, we refer to it as "V.S.'s phone" for ease of reference.

6.

V.S. showed the officer several videos originally recorded on a home security system. Multiple cameras provided surveillance footage of the area surrounding the house. The first video that V.S. played was captured by a front door camera the previous day. It showed a man exiting the house immediately prior to the subject incident. The officer asked, "So is this cousin?" V.S. said yes. It is undisputed that the original iPhone recording of the incident was made by a male cousin of defendant's ex-wife (hereafter "the cousin").

The body camera footage on the file labeled "Code_6-3" shows the investigating officer using his work cell phone to record the videos that were played for him on V.S.'s phone. The officer's cell phone recordings are part of defendant's exhibit C in separate files, each labeled with the prefix "VIDEO_2021-09-04" followed by a series of six numbers. The six numbers correspond to the exact moment when the officer tapped his phone to begin recording. For example, the body camera footage in "Code_6-3" shows the officer beginning to record at 09:16:48 (9:16 a.m. and 48 seconds) and tapping his phone to stop the recording at approximately 09:17:10. The file labeled "VIDEO_2021-09-04_091648…" is the 22-second video recorded on the officer's phone.[2]

V.S. eventually began to play footage from the cousin's iPhone recording. The officer reacted by saying, "Oh, where was—where'd you get this?" "This is new." As shown in the body camera footage on the "Code_6-3" file, the officer began making a recording of the video with his cell phone at 9:19 a.m. and 58 seconds. The officer stopped recording at approximately 9:20 a.m. and 32 seconds, but the video on V.S.'s

_____

[2]All of the body camera videos show the words "AXON BODY" in the upper right corner of the screen. All videos from the officer's cell phone show the words "AXON CAPTURE." Unlike the body camera videos, the cell phone videos display the date and time in what appears to be Coordinated Universal Time (UTC). Using the example above, the video in file "Code_6-3" shows the officer starting to record when the time counter reads 09:16:48 but the time counter displayed in file "VIDEO_2021-09-04_091648…" begins at 16:16:48. The audio in both files is exactly the same, including the background noise of the room and the conversation between the officer and V.S. This is true of the audio on all the corresponding "AXON BODY" and "AXON CAPTURE" videos.

phone continued to play until V.S. stopped it a few moments later. The officer's 34-second recording is on a separate file labeled "Video_2021-09-04_091958…."

We have excerpted the following image from the officer's cell phone recording, i.e., the file labeled "Video_2021-09-04_091958…." This frame is visible at the beginning of the video:



The person on the right is defendant. He is in the act of deploying a burst of pepper spray with his right hand. In his left hand is an object described in the record and briefs as a "golf training tool" (V.S. called it a "metal rod").

V.S. is the person on the left. He is holding a hammer in his right hand. The hammer is located below his waist, and the head of the hammer is parallel to his right knee.

Following his meeting with V.S. and defendant's ex-wife, the investigating officer left the house and went to defendant's place of business. A second officer provided back-up support. In addition to the body camera footage on "Code_6-3," defendant's arrest can be seen from the perspective of the assisting officer on a video file labeled "1011-AGA."

Speaking to defendant in front of the auto repair shop, the investigating officer told him, "I'm going to place you under arrest for assault with a deadly weapon." Defendant asserted that "it was self-defense" and made the same demonstrative gestures as before, alleging V.S. raised the hammer above his shoulder and "cock[ed]" it back as if preparing to strike with a downward blow. The officer replied, "Okay, well I saw the video. So I'm calling bullshit on that."

Defendant continued to argue self-defense, saying "I can't just have somebody just take a swing …." The officer responded, "He wasn't taking a swing; he had it down right here, and then you went in his face." On the assisting officer's body camera video (file "1011-AGA") the investigating/arresting officer can be seen lowering his hand below his waist when saying "he had it down right here," and simulating the use of pepper spray when saying "then you went in his face." In other words, the officer demonstrated what is shown in the image above. Defendant continued to insist, with his own gestures, "His hand went up, … and it's very clear that's what happened." The exchange ended with the officer saying, " Okay. Well turn around right now [and] put your hands behind your back."

**September 5, 2021**

On September 5, 2021 (the day after the arrest), the investigating officer twice returned to the marital home to speak with defendant's ex-wife and V.S. On the first

10.

visit, he inquired about obtaining "the cell phone video," i.e., "the one [where] he's actually getting sprayed." Defendant's ex-wife claimed to have "sent" the video to V.S., and that V.S. had in turn attempted to "upload" the file using a "link" the officer had provided to them.

The officer specified he wanted the video "sent from cousin," further explaining himself by showing V.S. the recording he made the previous day on his work cell phone, i.e., the file labeled "Video_2021-09-04_091958 …." V.S. replied that he was "already sending" it. The officer later asked, "Where is cousin who recorded that? … Does he have a phone number?" The ex-wife said her cousin lived out of town. In response to the second question she said, "No, he—it's kind of hard to get hold of him because he doesn't. … But I can get him to testify." The officer responded, "That's just something the [prosecutor will ask about], like 'why wasn't cousin talked to.'" Defendant's ex-wife disclosed the cousin's name and the city where he allegedly lived.

The officer stayed at the house for half an hour before leaving "to go look for those videos" at the police station, referring to the iPhone recording and surveillance videos that V.S. was supposed to "upload." The officer had previously explained, "I can only check at the station." He returned to the house later that afternoon to re-record the iPhone footage on his work cell phone, stating his assumption that V.S.'s files were "still uploading."

Body camera footage of the officer's second visit to the house on September 5, 2021, is part of defendant's exhibit C on a file labeled "Axon_Body_3_Video_2021-09-05_1348 …." This four-minute video shows the officer using his cell phone to make another recording of the "video [of] the incident … that cousin took." This recording was steadier and more centered than the clip he made the previous day, and it captured the entirety of the footage shown to him by V.S. It is included in defendant's exhibit C on a file labeled "Video_2021-09-05_134918 …."

**Additional Information**

There are two versions of the iPhone recording. A video file introduced at trial as "People's Exhibit 2" contains incomplete footage from the first version. The investigating officer's cell phone videos depict what can be seen in the second version.

The complete recording, or at least the most complete version known to exist, is two minutes and two seconds long. This version is not part of the record on appeal. The prosecutor stated the length in court, and the statement is corroborated by other exhibits introduced at trial by the defense. "Defendant's Exhibit A" and "Defendant's Exhibit B" are screen shots from the complete recording. The images were captured at 00:31 and 00:32 on a time counter showing the total duration of 02:02.

The second version is what defendant calls the "cutoff video." In both cell phone recordings made by the investigating officer, a white rectangular box is momentarily visible at the bottom of the screen on V.S.'s phone. The box, which disappears after approximately one second, indicates the full length of the video (meaning the video V.S. played for the officer on his own device, displayed as "-01:31"). In the image shown, *ante*, the white box is fading away as it reads -01:30. The officer's cell phone recording from September 5, 2021 (the file labeled "Video_2021-09-05_134918"), shows the entire cutoff video.

Since the original iPhone recording is 31 seconds longer than the version seen on V.S.'s phone prior to defendant's arrest, someone must have edited the source material on the day of the incident or early the next morning. Defendant reasonably assumes the cutoff video was created by the cousin, defendant's ex-wife, or V.S. Defendant further assumes this was done to portray V.S. in a more favorable and sympathetic light.

The People eventually obtained the complete version. As explained by the prosecutor, it was partially redacted for trial because "at the end it has a scene where a witness, [C.P.], is making hearsay statements." What can be heard is actually C.P.'s conversation with a 911 dispatcher, as well as statements made by the cousin and defendant's ex-wife. Neither the cousin nor the ex-wife testified at trial, nor were the

12.

emergency calls played for the jury. People's exhibit 2 thus shows only the first 81 seconds of the original recording. The remaining footage can be seen on the investigating officer's second cell phone recording of the cutoff video (not shown at trial). Viewed together, People's exhibit 2 and the file labeled "Video_2021-09-05_134918…" show the entire two minutes and two seconds of what the cousin documented as the events were happening.

The cutoff video omits the initial 31 seconds of the original recording. In other words, what is shown in the first 31 seconds of People's exhibit 2. This footage begins with defendant walking in the street and holding the "golf training tool" in his right hand. As most accurately described by his trial counsel, defendant then "takes a couple of quick steps" toward a semitruck (the "Freightliner") parked along the curb outside the marital home. The front end of the Freightliner is facing the front end of defendant's ex-wife's car, and the hood of the car is open.

The Freightliner is not visible until seven seconds into the video. As the time counter moves from 00:07 to 00:08, the camera pans to the right to show defendant moving between the vehicles and onto a sidewalk. At 00:08, V.S. can be seen standing on the sidewalk. He is already several feet away from the open door of the Freightliner before defendant reaches the curb.

By 13 seconds into People's exhibit 2, the men are standing chest-to-chest and V.S. can be seen holding a hammer below his waist with his right hand. Defendant transfers the "golf training tool" from his right hand to his left hand a few moments later. The men eventually step back from each other but continue to hold their weapons below waist level. V.S. points to his own face and head several times with his left hand, occasionally lifting the hammer up above his knee with the other hand. The video does not show him ever raising the hammer above his waist.

V.S. was speaking in Punjabi and repeatedly daring defendant to strike him. According to a transcript attached to the People's trial brief, he said, "Hit me. Try hitting

13.

me. Hit me. Hit me." "Try hitting me, I'll open up your jaw." On cross-examination at trial, V.S. admitted making those statements.

At the end of the footage omitted from the cutoff video (but visible on People's exhibit 2 at 00:26 - 00:30), immediately before V.S. is pepper-sprayed, V.S. is shown glancing down at the hammer several times while moving it slightly upwards and then backwards. His conduct presented a disputed factual issue as to whether defendant believed he was in imminent danger of bodily harm. The problem for defendant, which he either fails to appreciate or simply choses to ignore in his briefs, is that both the deleted footage and the cutoff video disprove his statements to the police about V.S. raising the hammer above his shoulder and cocking it back to swing at defendant.

The cutoff video begins with defendant pepper-spraying V.S. Although V.S. alleged defendant struck him immediately after spraying him, the video does not corroborate his allegation. V.S. is briefly out of view, but defendant essentially remains stationary for about three seconds with the "golf training tool" still below his waist. Defendant then leans forward and lifts his right arm. Although defendant's right hand cannot be seen, the movements suggest he pepper-sprayed V.S. a second time. All information in this paragraph can be seen on People's exhibit 2 at 00:32 to 00:35.

Next, both defendant and V.S. go out of view for approximately two seconds. The camera then shows V.S. running away from defendant, and defendant chasing V.S. down the street. Defendant lifts his right arm again in a manner suggesting further use of the pepper spray. At approximately 40 seconds into People's exhibit 2, as V.S. continues to flee, defendant pauses to transfer the "golf training tool" from his left hand to his right hand. Contrary to what V.S. told the investigating officer, V.S. retained possession of the hammer as he ran down the street.

It is undisputed defendant continued to chase V.S., caught up with him, and had a second physical altercation with him. The second altercation is not clearly visible in any

14.

version of the recording. The salient footage ends approximately one minute and 10 seconds into People's exhibit 2.

Defendant admitted striking V.S. with the "golf training tool" during the second altercation. He claimed to have acted in self-defense in response to V.S. actually swinging the hammer at him. No version of the iPhone recording supports or refutes this story because the men are too far away from the camera for it to show what is happening. The recording does suggest, given defendant's transfer of the "golf training tool" to his right hand during the chase, that V.S.'s head injury was sustained during the second altercation.[3]

*Procedural Background*

**Pretrial History**

Defendant was charged with a single count of assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) Trial was originally scheduled for April 2023. Due to several continuances, the trial did not begin until February 27, 2024. On February 15, 2024, the charge was amended to assault by force likely to result in great bodily injury. (*Id*., § 245, subd. (a)(4).)

A trial readiness conference was held on February 22, 2024. On that date, defendant's trial counsel filed a document entitled "Motions In Limine." The motions are more accurately described as generic objections. The first "motion" was one sentence: "Defendant objects to the introduction of video evidence without proper foundation and [a]uthentication and the Court finds it has been properly [a]uthenticated and the Court finds it to be a complete and accurate record of the event."

---

[3]As previously noted, V.S. was struck on the left side of his head. During the initial confrontation, defendant held the "golf training tool" in his left hand as he and V.S. were facing each other. Defendant used his right hand to deploy the pepper spray. Even assuming he swung the "golf training tool" in the brief moment when both men were off camera, V.S. would have likely been hit on the right side of his body. Defendant transferred the object to his right hand while chasing V.S. and later testified to swinging it with his right hand during the second altercation.

15.

Another defense "motion" stated, "Defendant hereby objects to evidence which was not properly noticed that will put the defendant's right to a fair and impartial trial at risk. Object to any evidence where defendant was not given advance notice for proper preparation in accordance with due process."

The objections were generic because, according to statements by defendant's trial counsel, they were asserted before the defense knew the People had withheld discoverable evidence. Counsel claimed to have first learned about the People's failure to disclose the iPhone recording on February 23, 2024, i.e., the Friday before trial.

Another trial readiness conference was held on Monday, February 26, 2024. On that date, the People filed motions in limine and a trial brief. The trial brief identified anticipated video exhibits consisting of the redacted iPhone recording (People's exhibit 2) and "Surveillance video" from the home security system. The motions included arguments for admitting the videos into evidence.

**Discovery Dispute**

The motions in limine were heard prior to jury selection on February 27, 2024. The People's motions to admit the iPhone recording and the surveillance videos were discussed together. The prosecutor made an offer of proof that V.S. would authenticate the videos based on his personal knowledge of what they depicted.

Defense counsel said nothing about delayed discovery, but he did allege the existence of two versions of the iPhone video: "These recordings, one that was made by the individual with the cell phone, there was a complete audio or video made of the entire incident, not just the portion that the People want to introduce. [¶] So what happened was they deleted the first part that was focused on the victim and what the victim was doing and only submitted the second part where it was focused on the defendant approaching the victim in this case, … and so this is not complete, and that doesn't show the entire or complete incident."

16.

Defense counsel also made statements indicative of some confusion about the two different versions. Counsel mistakenly alleged the prosecutor did not have the complete recording. Counsel also stated, "We don't have the video because it was in the possession of the victim who refuses to come to court to authenticate it." The latter comment made no sense considering V.S. was on the People's witness list and the prosecutor had already said he would be testifying. Regardless, the prosecutor stated he was unaware of any longer versions.

The trial court ruled People's exhibit 2 was admissible subject to authentication: "If the victim or a witness took a video and deleted it, I mean, that's a proper subject for cross-examination, but I don't think it affects the admissibility of the video that has been presented. So provided it's authenticated, I think the Court will allow both videos to be introduced."

There were subsequent discussions about the ex-wife's restraining order against defendant. Evidence of the restraining order was ruled inadmissible. In arguing to exclude such evidence, defense counsel showed accurate knowledge about the belatedly disclosed iPhone footage:

> "[T]he video that they will show, will show that the victim in this case was standing on the sidewalk on the path to the shop with a hammer in his hand screaming at the defendant, 'Hit me, hit me, hit me.' [¶] So there was some provocation on the part of the victim, and it wasn't because my client was doing something extraordinary or trying to violate a court order. The victim in this case was outside on the sidewalk, not on the property, with a hammer in his hand antagonizing the defendant as [he was walking] to work."

On February 28, 2024 (the second day of trial), prior to opening statements, defendant's trial counsel informed the court about the People's delayed disclosure of evidence. Counsel claimed to have only just received, the previous evening, approximately 50 videos. The belatedly disclosed material included the complete version of the iPhone recording.

According to the attorney's statements, the People had properly disclosed only 17 videos. Counsel did not identify the timely disclosed material. With exception of the iPhone recording, counsel likewise refrained from identifying the newly disclosed material. Counsel explained he was previously shown the iPhone video and "thought it would be helpful to us, but we didn't get it until yesterday." Counsel also said, "I really didn't want to continue the case, because, again, when I saw the video, I thought it helped us." Those statements led to the following exchange:

> "THE COURT: But you have [the iPhone recording] now?
>
> "[DEFENSE COUNSEL]: I have it now.
>
> "THE COURT: Great. What's the problem?
>
> "[DEFENSE COUNSEL]: I'm moving to exclude anything else. [The prosecutor] showed that to me a week ago, and I didn't think it was a bad thing because it helps us.
>
> "THE COURT: What are you moving to exclude?
>
> "[DEFENSE COUNSEL]: Well, I don't know what other parts—so this is a collage of videos. What they have is part [home security system] camera, part—"

Defendant's trial counsel never answered the court's question, but it is clear he did not move to exclude People's exhibit 2. The motion was to exclude "anything else," meaning all untimely disclosed material except for the iPhone recording. Counsel later reiterated that he was not seeking a continuance.

According to the prosecutor, the district attorney's office did not receive V.S.'s videos until April 2023. The prosecutor explained, "I met with [V.S.] with an investigator, and he had all the videos that he had shown the officer and were on the officer's body cam, and I had advised him, hey, playing body cam to a jury isn't ideal. If [you] have the originals, please give us the originals."

V.S. reportedly provided his videos to the prosecutor and the investigator during the April meeting, prior to the original trial date, and the investigator "uploaded them into

18.

evidence.com." The prosecutor "was under the impression that once they were uploaded, they were discovered." He conceded, however, that something went wrong. As for the amount of belatedly disclosed evidence, the prosecutor explained: "A lot of the videos, the reason why there's so many is a lot of them are duplicative, also for trial purposes I [made] clips.… [¶] So there's some clips that I took that were, essentially, attorney work product. I [produced] all that as well yesterday."

The trial court denied the defense motion. For our purposes, both the motion and the ruling are irrelevant because none of V.S.'s other videos were introduced at trial. The People had intended to use the surveillance videos from the home security system but ultimately did not.

Defendant does *not* allege the delayed disclosure of any law enforcement videos. Based on the prosecutor's explanation, all of the untimely evidence was obtained directly from V.S. at the April 2023 meeting. The "17 videos" defense counsel acknowledged receiving in a timely manner presumably included all of the files on defendant's exhibit C.

### Trial Evidence

The People called two witnesses during their case-in-chief: V.S. and the investigating officer. The defense had three witnesses: an independent eyewitness who had called 911 (C.P.); an eyewitness who worked for defendant at the auto repair shop (K.F.); and defendant himself. The People presented a rebuttal case in which the investigating officer and a second police officer provided impeachment testimony. In a brief surrebuttal, defendant again testified on his own behalf.

V.S. acknowledged that defendant's ex-wife was his "girlfriend" and cohabitant during the relevant time period. V.S. had been attempting to jump start the ex-wife's car immediately prior to the incident. The ex-wife and her cousin were inside the house.

Defendant walked past V.S. on his way to and from the auto repair shop. The first time, as V.S. was standing outside of his Freightliner truck, defendant greeted him with a

19.

profane remark. On the second occasion, defendant was walking from the shop to his (defendant's) vehicle. V.S. struggled to clearly explain how the events unfolded, but it was undisputed defendant walked past him a second time.

V.S. testified defendant was carrying a "metal rod" (the "golf training tool") both of the times he walked past him. The second time, as defendant was walking to his own vehicle, defendant had said, "'If you want to have a fight, come on.'" Next, defendant turned around and approached V.S. a third time. He was now "running," which caused V.S. to be concerned for his safety. V.S. testified, "So when he started running toward me, I picked up a hammer from the truck for self-defense."

During the ensuing argument, V.S. admittedly pointed at his own head and told defendant to hit him. He failed to clearly explain that behavior. The only reason given for daring defendant to hit him was "[b]ecause repeatedly he was threatening to kill me."

V.S. alleged the injury to his left temple was sustained during the first altercation, i.e., before defendant chased him down the street. He admitted retaining possession of the hammer as he fled but denied ever "raising" or swinging it. The prosecutor asked him additional questions for the purpose of authenticating the cousin's iPhone recording. People's exhibit 2 was then admitted into evidence, without objection, and played for the jury. As previously explained, the video revealed several arguable discrepancies in V.S.'s story.

On cross-examination, V.S. confirmed the existence of a pending civil lawsuit against defendant. V.S. was suing him for approximately $300,000 in damages based on the subject incident. In addition to establishing this motive for embellishment, defense counsel highlighted other discrepancies in V.S.'s testimony as compared to certain allegations in the civil complaint.

The People's second witness, the investigating officer, was questioned about the "general layout for the area" where the incident occurred. Both sides spent an inordinate amount of time trying to establish whether defendant had a legitimate reason for parking

20.

near the marital home or did so merely to antagonize his ex-wife and V.S. The more relevant testimony concerned the officer's contact with the parties in response to the 911 call. This set up the prosecutor's use of body camera footage to show defendant claimed to have pepper-sprayed V.S. in response to V.S. raising the hammer above his shoulder.

The defense case began with the testimony of eyewitness C.P. The trial transcript suggests defense counsel hoped or expected C.P. to say defendant and V.S. were engaged in "mutual combat." Instead, she described defendant as appearing "more aggressive" and V.S. as "trying to defend himself." The defense quickly moved on to the next witness, K.F.[4]

K.F.'s testimony was apparently intended to explain why defendant parked near the home in which V.S. and the ex-wife were living. K.F. also testified to seeing defendant and V.S. "mutually arguing with each other." His testimony further served to establish that defendant "absolutely loves golf" and regularly used the golf training tool to practice his swing.

On cross-examination, K.F. admitted telling police that he saw V.S. "raise up the hammer as if he was going to strike [defendant] with it." The prosecutor then requested a demonstration of what he actually saw. Defense counsel described the demonstration for the record: "[The witness] raised his right hand up to his chest area, and he had made, like, a twitching motion with his shoulders." The People later impeached K.F. with rebuttal testimony from an officer who spoke to him at the scene. The officer testified K.F. claimed to have seen V.S. "raise the hammer as if he was going to strike [defendant] with it, and that's when [defendant] pepper sprayed [V.S.]."

---

[4]The People's trial brief identified C.P. as an anticipated witness for their case-in-chief. On or about the first day of trial, the prosecutor disclosed that he did not intend to call her. The defense may have read more into this decision than was warranted. Her testimony was consistent with statements she had made to a police sergeant at the scene. Body camera footage of the conversation is part of defendant's exhibit C on a file labeled "Aggravated _Assault_In_Progress-3 …." Although she did say the men "were swinging at each other," she also stated, "To me, like what I saw, was this guy was defending himself with a hammer."

21.

When defendant testified, he claimed to have filed a police report about V.S. roughly two weeks prior to the subject incident. V.S. and the cousin had allegedly confronted defendant, with the cousin looking on as V.S. threatened, "'I'm going to break your face where you're not going to be able to drink water.'" Defendant was asked on cross-examination if "it was because of that that [he] started carrying the pepper spray." He gave a nonresponsive answer: "I was scared because I was cornered, and I was frightened with two of them that I couldn't—I didn't feel safe."

The story about defendant's previous encounter with V.S. and the ex-wife's cousin was not new. He told an abbreviated version to the investigating officer the day before his arrest. However, the allegations were not otherwise corroborated by any of the trial evidence.

Defendant's trial counsel introduced some of the surveillance videos recorded on the officer's cell phone to show defendant was carrying the "golf training tool" when he walked past V.S. on the way to his (defendant's) truck. This may have been done to make clear defendant had a prior opportunity to attack V.S. if that was his intention. Describing himself as a "semi-pro" golfer, defendant explained he was done working for the week and was bringing the tool home with him for the weekend.

A major challenge for the defense was explaining why, after having walked past V.S. on the way to his vehicle, defendant turned around and went back to confront him. He testified, "That day I forgot my keys so I was starting to head back toward the shop." In this version of events, defendant quickened his pace because V.S. "had jumped out of his truck." He then stood his ground when V.S. made threatening gestures with the hammer.

On cross-examination, the prosecutor carefully pinned defendant down on both his explanation and the fact that he never returned to his shop prior to speaking with police at the scene. Defendant did not seem to realize he was walking into a trap. In the People's rebuttal case, the jury saw body camera footage of defendant pulling a ring of keys out of

22.

his pants pocket. The video showed him telling the police his driver's license was "in my truck," and handing the keys to an employee to retrieve it for the officers.

Defendant was forced to revise his explanation and admit the earlier testimony was given "in error." Upon further reflection, he recalled his purpose for walking back toward V.S. was to retrieve a key "for another truck." The prosecutor derided this testimony in closing argument, calling it "a load of BS."

The other major challenge for the defense was two-fold. First, the video evidence did not support defendant's recorded allegations to police about why he pepper-sprayed V.S. Second, the defense needed to explain why defendant chased V.S. when V.S. was attempting to retreat.

Defendant testified as follows: "He had the hammer down here, and he was kind of, like, jerked it back. To me it felt like his body was kind of doing this together, but when I felt that, when I saw that in the first one, then I got really scared, like something is going to happen. On the second time it went back, that's when I sprayed." As for chasing V.S. down the street, he said, "I was scared that if I turned back, that I may be hit by the hammer. So I was trying to get the hammer out of him."

### Verdict and Sentencing

The jury deliberated for approximately five or six hours (it is unclear whether a lunch break was taken). Near the one-hour mark, a request was made to see "the police report that the defendant filed 2 weeks prior to the date of [the] incident." The trial court responded, "Police reports are not admissible as evidence."

The jury later inquired, "What happens if one juror disagrees with the other eleven?" The trial court instructed the jurors to read CALCRIM No. 3551 regarding further deliberations. The jury eventually found defendant not guilty of aggravated assault but convicted him of misdemeanor assault as a lesser included offense.

At sentencing, defendant was granted probation and ordered to serve 30 days in jail. A timely notice of appeal was filed in April 2024.

23.

Defendant's claim is presented under the rubric of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). A *Brady* claim invokes the federal due process clause and its protection against governmental suppression of evidence in criminal cases. (*People v. Whalen* (2013) 56 Cal.4th 1, 64.) The standard of review is de novo. (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], [and] that the duty encompasses impeachment evidence as well as exculpatory evidence [citation] …." (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1042.) "'[T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" (*Id*. at pp. 1042–1043.)

Under California law, prosecutors also have a statutory duty to disclose "[a]ny exculpatory evidence." (Pen. Code, § 1054.1, subd. (e).) Such evidence must ordinarily be turned over at least 30 days prior to trial. (*Id*., § 1054.7.) Defendant does not rely upon or even cite this statutory authority in his briefs. His claim appears to be exclusively based on federal due process principles.

The facts of this case do not establish a *Brady* violation. A true *Brady* violation "involves the discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense." (*United States v. Agurs* (1976) 427 U.S. 97, 103, italics added.) Any evidence presented at trial "'is not considered suppressed,

24.

regardless of whether or not it had previously been disclosed during discovery.'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 281, quoting *People v. Morrison* (2004) 34 Cal.4th 698, 715; see *U.S. v. Gray* (7th Cir. 2011) 648 F.3d 562, 567 ["The *Brady* rule is not a rule of pretrial discovery"].)

Defendant relies on *People v. Mora and Rangel* (2018) 5 Cal.5th 442 (*Mora*). There, our state Supreme Court again stated that "[e]vidence actually presented at trial is not considered suppressed for *Brady* purposes," but it acknowledged some federal courts will entertain *Brady* claims based on "delayed disclosure rather than 'total nondisclosure.'" (*Mora*, at p. 467.) The *Mora* opinion provides two examples: *U.S. v. Scarborough* (10th Cir. 1997) 128 F.3d 1373 and *U.S. v. Devin* (1st Cir. 1990) 918 F.2d 280. However, the delayed disclosure claims in *Mora*, *Scarborough*, and *Devin* all arose from the denial of defense requests for continuances, dismissals, and/or mistrials. (*Mora*, *supra*, at pp. 464–466; see *id*. at p. 469 [finding no prejudice from late disclosure where, "short of a new trial, neither Mora nor Rangel sought a remedy the court did not provide"]; *U.S. v. Scarborough*, *supra*, at p. 1376 ["the defense moved to dismiss the case and for sanctions against the government …. The judge denied the motion and sanctions on the grounds that any harm to the defense from the late disclosure of the exculpatory material could be cured by cross-examination"]; *U.S. v. Devin*, *supra*, at pp. 288–289 [motion for mistrial denied; four-day continuance granted but request for further continuance denied].)

Under federal law, the presumptive remedy for late disclosure of *Brady* material prior to the adjudication of guilt is a continuance. (*U.S. v. Mathur* (1st Cir. 2010) 624 F.3d 498, 506; *U.S. v. O'Hara* (7th Cir. 2002) 301 F.3d 563, 569; see *U.S. v. Finley* (9th Cir. 2002) 301 F.3d 1000, 1018.) "A continuance affords time to study the newly emergent information, consider its possible ramifications, change trial strategy (if necessary), assess any potential prejudice, and determine how best to use the information." (*U.S. v. Sepulveda* (1st Cir. 1993) 15 F.3d 1161, 1178.) "As a general

rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery." (*Ibid.*; see *U.S. v. Higgins* (7th Cir. 1996) 75 F.3d 332, 335; *U.S. v. Osorio* (1st Cir. 1991) 929 F.2d 753, 758 ["Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously"].)

Where a continuance or other remedial measure is requested and denied, the test for prejudice "is whether defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.'" (*U.S. v. Devin*, *supra*, 918 F.2d at p. 289.) But if no remedies are requested at trial, a defendant has no basis to contend the late disclosure was prejudicial. (See *U.S. v. Mason* (D.C. Cir. 2020) 951 F.3d 567, 573 [stating "a continuance of reasonable length negates any prejudice arising from time constraints alone"]; *U.S. v. Moreno* (3d Cir. 2013) 727 F.3d 255, 262 [failure to request continuance cited among reasons for rejecting late disclosure claim]; *U.S. v. Mota* (7th Cir. 2012) 685 F.3d 644, 649 [same]; *U.S. v. Mitchell* (9th Cir. 2007) 502 F.3d 931, 989 [same]; *Lawrence v. Lensing* (5th Cir. 1994) 42 F.3d 255, 258 [stating a defendant "cannot convert his tactical decision not to seek a recess or continuance into a *Brady* claim"].)

In short, "defense counsel must typically request a continuance to preserve a claim of prejudice by delayed disclosure of evidence." (*U.S. v. Smith* (1st Cir. 2002) 292 F.3d 90, 102.) California case law is in accord. (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1131 [rejecting claim based on late discovery where defendant did not seek a continuance]; *People v. Sanchez* (1998) 62 Cal.App.4th 460, 474, fn. 8 [alleged *Brady* error deemed harmless where prosecution disclosed evidence during trial and defense failed to request a continuance].) "Where there has been a failure of discovery the normal remedy is not dismissal or the suppression of evidence, but a continuance to enable the defense to meet the new evidence." (*In re Jessie L.* (1982) 131 Cal.App.3d

26.

202, 210, citing *People v. Reyes* (1974) 12 Cal.3d 486, 501–502 and *People v. McGowan* (1980) 105 Cal.App.3d 997, 1002.)

"The trial court [is] under no obligation to volunteer, sua sponte, that the defense [can] have an unrequested continuance." (*People v. Alcala* (1992) 4 Cal.4th 742, 782.) Therefore, assuming defendant's claim was preserved for appellate review, merely establishing the delayed disclosure of favorable evidence is not enough. He must further demonstrate "'that a continuance would not have cured the harm.'" (*People v. Thompson*, *supra*, 1 Cal.5th at p. 1103; accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 668–669.)

Defendant's arguments all boil down to speculation about how the defense case might have been different if he and his trial counsel were afforded more time to evaluate the belatedly disclosed evidence. In other words, what he might have accomplished with the benefit of a continuance that was never requested. Examples include "having the [iPhone] video analyzed, both for content and authenticity," and more effectively cross-examining/impeaching V.S. on the witness stand.

Defendant envisions scenarios in which People's exhibit 2 would have been excluded for lack of foundation. His arguments are misguided and unrealistic. Video evidence need not be authenticated by the person who recorded the footage. "'[I]t is well settled that the testimony of a person who was present at the time a film was made that it accurately depicts what it purports to show is legally sufficient foundation for its admission into evidence.'" (*Jones v. City of Los Angeles* (1993) 20 Cal.App.4th 436, 440, fn. 5.) Someone obviously deleted part of the original recording before it was shown to the investigating officer, but such editing does not call into question the *authenticity* of any version of the recording. The trial court basically said this when ruling on the motions in limine.

Furthermore, defense counsel refrained from objecting at trial. After V.S. provided foundation testimony and the prosecutor moved to admit People's exhibit 2 into

27.

evidence, the trial court asked, "[Defense counsel], any objection?" The attorney replied, "No." It is unavailing for defendant to now imagine how his attorney "would have tried to require [the] cousin to appear at trial" to authenticate the recording or be questioned about a conspiracy to mislead the police. In any event, defendant fails to show or even argue that a continuance would not have cured the alleged harm.

The closest defendant comes to addressing the dispositive issue is in the reply brief, where he claims his trial counsel "was not in a position to fully consider the ramifications of what the disclosure of the [iPhone] video showed." This argument is disproven by the fact his contentions on appeal are all based on inferences drawn from the law enforcement videos. As previously discussed, there are no allegations of delayed disclosure of that material.

The body camera footage and the investigating officer's cell phone videos show V.S. possessed, on the morning after the incident, a recording of the incident that was only 1 minute and 31 seconds long. The law enforcement videos also show the investigating officer repeatedly asking V.S. and defendant's ex-wife to "upload" the source material for police access. During those conversations, the ex-wife claimed to have "sent" the recording to V.S. so he could provide it to the officer. When the officer later inquired about contacting the videographer, i.e., the cousin, defendant's ex-wife said he did not have a phone number. If the cousin did not have a phone number, whose device was he using to record the incident? In the cutoff video, which the defense had ample time to study before trial, the cousin can clearly be heard telling the ex-wife, "I got the video on my phone."

For anyone sufficiently familiar with the law enforcement videos, the revelation that a longer version of the iPhone recording existed would have raised questions about who created the cutoff video, whether V.S. knew he was showing an edited recording to the officer, and the possibility of a deliberate effort to withhold evidence from police and prosecutors. Defendant's trial counsel did express an understanding that someone

28.

"deleted the first part that was focused on the victim and what the victim was doing."  If counsel needed more time to "consider the ramifications of what the disclosure of the [iPhone] video showed," he could have requested a continuance.  When parties forgo "the opportunity to seek a continuance in order to develop a response" to late discovery, a reviewing court may "refuse to speculate as to what evidence may or may not have been introduced had the [material] been timely produced."  (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1131.)

Defendant's focus on his counsel's assessment of the discovery issue at the beginning of trial is also unpersuasive.  The defense could have requested a continuance any time between the first viewing of the complete recording on Friday, February 23, 2024, and the close of evidence on Friday, March 1, 2024.  Defense counsel could have alternatively requested a mistrial or even moved for a new trial following the jury's verdict.  As stated at the outset of this opinion, defendant's failure to seek any remedy below is "fatal" to his claim.  (*People v. Thompson*, *supra*, 1 Cal.5th at p. 1103.)

**DISPOSITION**

The judgment is affirmed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.

29.